# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **ROSIE M. SMITH,** | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No. 3:11-cv-00651** |
| **v.** | ) **Judge Nixon / Knowles** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,[1]** | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Supplemental Security Income payments ("SSI") and Disability Insurance Benefits ("DIB") as provided under Titles XVI and II of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 10. Defendant has filed a Response, arguing that the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

1

decision of the Commissioner was supported by substantial evidence and should be affirmed.

Docket No. 18

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed her application for SSI on September 6, 2001, and her application for DIB on September 7, 2001, alleging that she had been disabled since September 3, 2001, due to depression, mental retardation, headaches, inability to balance, and previous suicide attempts. Docket No. 4, Attachment ("TR"), TR 58, 85, 425. Plaintiff's applications were denied initially (TR 30-31, 429-30), upon reconsideration (TR 32-33, 436-37), and by Administrative Law Judge (ALJ) Mack H. Cherry, in a decision rendered on July 16, 2004 (TR 15-25), following an administrative hearing (TR 440-77). Plaintiff sought review of ALJ Cherry's decision by the Appeals Council. TR 13-14. On April 18, 2005 (TR 5-7) and July 19, 2005 (TR 524),[2] the Appeals Council denied review, rendering the denial of Plaintiff's applications the final decision of the Agency. Plaintiff filed suit in this Court pursuant to 42 U.S.C. § 405(g). Docket No. 1. This Court affirmed the ALJ's decision (TR 568-605), and

_____

[2] On April 18, 2005, the Appeals Council denied Plaintiff's request for review of ALJ Cherry's decision. TR 5-7, 524. The Appeals Council subsequently received a letter from Plaintiff's counsel, as well as additional evidence consisting of treatment records from Dr. Chang and Plaintiff's mental health therapist. TR 524. On July 16, 2004, the Appeals Council issued a second letter denying review. *Id.* In that letter, the Appeals Council stated that because a civil action had been filed, the SSA no longer had jurisdiction over the matter, but noted that the additional records actually showed that Plaintiff's condition had improved, such that Plaintiff was again cleaning houses. *Id.*

Case 3:11-cv-00651   Document 19   Filed 04/15/13   Page 2 of 32 PageID #: 1055

Plaintiff timely filed her objections (TR 536-67). Upon *de novo* review, this Court remanded the case for further proceedings. TR 525-35, 606-08. Following remand, Plaintiff received a second hearing. TR 910-34. Plaintiff's second hearing was conducted on April 9, 2009, by Administrative Law Judge ("ALJ") Donald E. Garrison. *Id*. Plaintiff and vocational expert ("VE"), Jane Brenton, appeared and testified. *Id*.[3]

On July 31, 2009, ALJ Garrison issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 493-516. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since September 3, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant's "severe" impairments have been a depressive disorder, not otherwise specified; an anxiety disorder, not otherwise specified; and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).
>
> 5. The claimant can perform a full range of work at all exertional levels that is limited by understanding, remembering, and carrying out only short and simple instructions; making judgments on simple work-related decisions; having occasional contact with the public, supervisors, and co-workers; and avoiding any production-rate pace work or work that requires any changes in work requirements or procedures.

---

[3] Dr. Malcolm Brahms was also present at the hearing, but did not testify. See TR 910, 911.

6. The claimant cannot perform any past relevant work (20 CFR 404.1565 and 416.965).

7. As she was born on November 4, 1966, the claimant was 34 years old, which is defined as a younger individual not younger than eighteen or older than forty-four, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has no significant literacy skills but can communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering her age, education, work experience, and residual functional capacity, no jobs that the claimant could perform have existed in significant numbers in the national economy (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the SSA, from September 3, 2001 through the date of this decision (20 CFR 404.1520(g) and 416.929(g)).

TR 509-16.

On August 7, 2009, Plaintiff timely filed a request for review of ALJ Garrison's decision. TR 491-92. On May 17, 2011, the Appeals Council issued a letter finding no reason to assume jurisdiction (TR 478-80), thereby rendering ALJ Garrison's decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the

4

extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985)

5

(citing *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

6

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[11]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1. or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 CFR 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*,

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in: 1) "rejecting" the opinion of Dr. Chang, one of Plaintiff's treating psychiatrists; 2) "rejecting" the opinion of Dr. Lakhani, another of Plaintiff's treating psychiatrists; 3) according little weight to the opinion of Ms. Reding, Plaintiff's therapist; and 4) finding that Plaintiff could work full-time. Docket No. 11. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

8

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1. Weight Accorded to the Opinion of Dr. Chang

Plaintiff argues that, "[s]ubstantial evidence does not support the ALJ's residual functional capacity assessment, corresponding hypothetical questions to the vocational expert upon which the ALJ relied, adverse credibility finding, and step-five decision because the ALJ erroneously rejected treating psychiatrist Dr. Chang's February 2003 opinions." Docket No. 11 at 6. Plaintiff additionally argues that the ALJ violated the District Court's June 2008 Order and "thereby the law of the case" because ALJ Garrison: 1) did not determine whether Dr. Chang's opinion was consistent with the substantial evidence of record, and therefore entitled to controlling weight; 2) "misevaluated" the evidence; 3) "erroneously rejected" one of Dr. Chang's findings based on Plaintiff's two hour meeting with her representative; and 4) improperly rejected Dr. Chang's opinion based on GAF scores. *Id.* at 6-13. Additionally, Plaintiff asserts that the ALJ did not articulate "good reasons" for the weight he accorded Dr. Chang's opinion. *Id.*

Defendant responds that, after a detailed evaluation and discussion of the medical evidence, Plaintiff's testimony, and other opinions of record, the ALJ properly assigned Dr. Chang's opinion "little weight." Docket No. 18 at 17-27. Defendant contends that the ALJ properly discussed and explained his reasons for not according controlling weight to Dr. Chang's opinion "and therefore his RFC was properly determined and his hypothetical questions properly posed." *Id.* Defendant recognizes that Dr. Chang was one of Plaintiff's treating psychiatrists, but notes that, prior to completing his Medical Source Statement regarding Plaintiff, Dr. Chang saw

9

Plaintiff for only three brief, fifteen minute medication checks over an eight week period, and therefore did not actually spend much time with Plaintiff. *Id.* Defendant maintains that the ALJ's recognition and consideration of this limited frequency was proper. *Id.* Defendant also takes issue with Plaintiff's contention that the ALJ "rejected" Dr. Chang's opinion based on GAF scores. *Id.* Defendant notes that the ALJ did not "reject" Dr. Chang's opinion, but rather, assigned it "little weight" after a proper review of all the evidence of record. Defendant stresses that the ALJ rendered his decision after consideration of the evidence of record, and not based upon the GAF scores or any other single piece of evidence. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in

10

paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . .

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR 416.927(d) (emphasis added). *See also* 20 CFR 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 CFR 404.1502.

Regarding Dr. Chang's records and findings, the ALJ stated:

In December 2002, the claimant saw David Chang, M.D., another MHC psychiatrist, for the first time. She reported her symptoms had worsened so much she though she should be hospitalized but Dr. Chang did not agree. A month later, the claimant told Dr. Chang she had tried to work but people were 'taking advantage' of her. Each time, Dr. Chang saw the claimant for only fifteen minutes.

. . .

11

[In February 2003], the claimant expressed frustration with the process of getting disability and how long it was taking to Dr. Chang, who saw her for only fifteen minutes.

That same day, Dr. Chang reiterated the claimant's diagnosis and her GAF score of 55 with the highest score in the previous year being 60, which indicated moderate, but almost mild, symptoms. He opined the claimant had no useful abilities to remember work-like procedures, to maintain attention and concentration for two-hour segments, to maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in a routine work setting, to deal with normal work stress, to carry out very short and simple instructions, to carry out detailed instructions, to set realistic goals or make plans independently of others, to deal with stress of skilled or semiskilled work. Dr. Chang also opined the claimant had seriously limited but not precluded abilities to understand and remember very short and simple instructions, to understand and remember detailed instructions, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, to interact appropriately with the general public, and to travel in unfamiliar places or use public transportation. Dr. Chang opined the claimant had satisfactory abilities to sustain an ordinary routine without special supervision, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. He indicated the claimant had a moderate restriction in her activities of daily living and marked limitations in maintaining social functioning and maintaining concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. Finally, Dr. Chang opined the claimant would be expected to miss more than three days of work a month.

. . .

From November 2003 to January 2004, the claimant told Dr. Chang and his nurses about intermittent symptoms and problems with concentration. She also reported being treated poorly by her

12

children. Her symptoms became worse in February 2004, yet, six
weeks later, the claimant reported better tolerance of stress that
had increased. Dr. Chang advised her "not [to] do everything for
everyone."

. . .

In June 2004, the claimant told Dr. Chang she was "starting to
think of life without the disability acceptance [and she would] not
let her children to [*sic*] run over her." She said she was trying to
work odd jobs and want[ed] to obtain her GED...[which] actually
help[ed] her feel better as she [wa]s able to get out more often."

. . .

[In September 2004], the claimant told Dr. Chang she was
"*[t]rying to engage in more activities* [such as] visiting the sick
and shut-ins and helping them" (emphasis added). She said she still
felt "frustrated and depressed but [was] getting better." Dr. Chang
found she looked "much more upbeat and brighter [and he]
encouraged her to do more for herself.

. . .

In December 2005, the claimant reported worse symptoms to Dr.
Chang, but a month later, she told him she was feeling better. The
claimant said she was *working part-time cleaning houses* and
trying to "limit the negative impact of other people in her life." Dr.
Chang found she was "smiling more broadly" and "not waiting for
disability." He added she was "ready to live life."

TR 500-02 (italics original)(internal citations omitted).

After summarizing all of the medical evidence of record, the ALJ then assessed the

opinion evidence. Regarding his assessment of Dr. Chang's opinion, the ALJ explained:

Dr. Chang's opinion was inconsistent with his GAF score both at
that time (55, or moderate symptoms) and over the previous year
(60, or moderate, though almost mild, symptoms). His assessment
was also inconsistent with the medical evidence. For example, Dr.
Chang opined the claimant had no useful ability to maintain
attention in two-hour segments and a seriously limited ability to
deal with the general public. A few days earlier, however, the

13

> claimant told Ms. Anderson she had spent two hours in her
> attorney's office trying to get him to work on her case. Dr. Chang
> found the claimant had a moderate restriction in her ability to
> perform her activities of daily living, yet the claimant told Dr.
> O'Brien just a few months earlier she performed all her activities
> of daily living. Finally, Dr. Chang had only seen the claimant a
> few times for fifteen minutes each time over the course of a few
> months when he made his assessment. Dr. Chang's assessment,
> therefore, also receives little weight.

TR 514.

As the ALJ illustrated in his thorough evaluation of the medical evidence, Dr. Chang's February 2003 opinion is inconsistent with the overall evidence of record, including the narrative in Dr. Chang's own treatment notes. On several occasions following the February 2003 assessment, Dr. Chang noted that Plaintiff showed improvement. For instance, he noted that she felt better trying to work and get her GED; she felt better when she could get out more often; she was trying to engage in activities within the community; and she reported feeling better after getting a part-time job cleaning houses and limiting the negative impact of others in her life. TR 502, 671, 673, 669.

Although Dr. Chang was Plaintiff's treating psychiatrist, as has been noted, Dr. Chang's opinion contradicts other substantial evidence in the record. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 CFR 416.927(d)(2) and 20 CFR 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above, and the final decision regarding the weight to be given to the differing opinions lies with the

14

Commissioner. *Id.*, 20 CFR 416.927(e)(2). Accordingly, for the reasons discussed above, the

Regulations do not mandate that the ALJ accord Dr. Chang's evaluation controlling weight.

Moreover, the ALJ's decision is supported by the comprehensive psychological

examination conducted by Arthur Stair, M.A., on December 17, 2008. TR 506-07, 694-703. The

ALJ discussed Mr. Stair's findings, stating:

> [A]t SSA's request, Arthur Stair, M.A., a psychological examiner,
> interviewed the claimant and administered psychological and
> intelligence tests. The claimant said she *never had a driver's
> license*. She stated she had been a slow learner who had received
> special education classes. The claimant reported she was
> depressed, *could not be "around people"* (emphasis added), and
> had hallucinations but was not scared by them. She stated she was
> better before her "nervous breakdown" but did not specifically
> identify when that occurred. The claimant denied having had any
> psychiatric hospitalizations. She said her childhood was not very
> good because she "had to raise [her]self and [her] sister," but she
> did not have any significant abusive issues while growing up. The
> claimant stated her previous job was several years earlier and she
> had difficulty with reading and mathematics. The claimant denied
> any history of hallucinations, suicidal gestures, or symptoms of
> mania or hypomania. She said she took her daughter to school
> everyday and that she would "just sit at home." The claimant then
> stated she would "then have to go out and do something." She said
> she wanted to get her GED but was not sure if she could. The
> claimant said she *saw people four to five times a week*. She stated
> most days were bad and, on those days, she "just sits at home and
> cries." Mr. Stair found the claimant had a fair to poor level of
> executive functioning and a below average ability to abstract and
> think logically. He found her thinking to be "concrete and
> simplistic" and noted she had no difficulty with maintaining
> logical and coherent train of thought if the subject matter was very
> simple. Mr. Stair also found she had a fair attention span,
> appropriate affect, normal speech, and good eye contact. He
> estimated her intelligence was in the borderline range. Mr. Stair
> found the claimant could do only very simple addition but missed
> several answers by only one, which he described as a "rather
> unsophisticated way to *intentionally* pick a wrong number"
> (emphasis added). Based upon the results of the Wechsler Adult

15

Intelligence Scale-III (WAIS-III), Mr. Stair estimated that the claimant had a Verbal IQ of 61, a Performance IQ of 65, and a Full Scale IQ of 60. Based upon the results of the Wide Range Achievement Test (WRAT-IV), he estimated that she could read at a first grade level, spell at a kindergarten level, and do arithmetic at a first grade level. He noted the claimant obtained the lowest possible scores for each subtest. Based upon the Wechsler Memory Scales-III (WMS-III), Mr. Stair opined the claimant's working memory was in the extremely low range. Based upon the results of the Vineland Adaptive Behavior Scales-Second Edition (VBAS-II), he opined the claimant's adaptive functioning was the low range. After he reviewed all the results, Mr. Stair continued to believe the claimant's intellectual functioning was at the borderline level. He opined "the claimant appear[ed] to be attempting to present herself as being of lower intelligence than she really [wa]s." Mr. Stair diagnosed a mild depressive disorder, NOS; a mild anxiety disorder, NOS with mild panic features, and borderline intellectual functioning. Charlton Stanley, Ph.D., a psychologist, also signed Mr. Stair's report. Mr. Stair opined that the claimant had satisfactory abilities to make judgments on simple work-related decisions, to understand and remember complex instructions, to carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers, to respond appropriately to usual work situations and to changes in a routine work setting. He also opined the claimant had satisfactory to good abilities to understand and remember short and simple instructions and to carry out short and simple instructions.

TR 506-07 (italics original)(internal citations omitted).

With regard to his evaluation of Mr. Stair's opinion, the ALJ explained:

Mr. Stair made a comprehensive psychological examination of the claimant with thorough psychological and intelligence testing. Thus, his opinion . . . receives significant weight.

. . .

Again, only Mr. Stair's opinion is consistent with the medical evidence. He conducted an extensive interview and administered a

thorough battery of tests unmatched by any other source. Mr. Stair
also tried to resolve inconsistencies in the claimant's subjective
reports that no one, other than Dr. O'Brien, tried to do.
Consequently, Mr. Stair's opinion is the only one entitled to
significant weight, and that opinion formed the basis for the mental
portion of the residual functional capacity given above.

TR 513-15.

As discussed by the ALJ, Mr. Stair performed a comprehensive psychological exam

including an "extensive interview" and "a thorough battery of tests," and attempted to "resolve

inconsistencies in [Plaintiff's] subjective reports." *Id.* Based on this, and the fact that Mr. Stair's

opinion was consistent with the overall evidence of record, the ALJ accorded it significant

weight.

Progress notes from Plaintiff's treatment at Centerstone also support the ALJ's decision.

The ALJ thoroughly discussed these notes:

In January 2003, the claimant told Ms. Anderson she continued to
have symptoms but felt "much better." The claimant again
complained about the disability process and said she was "making
contacts herself to find out how the paperwork [wa]s going."

Two weeks later, the claimant told Ms. Anderson her situation was
"'depressing but [she was] dealing with it'" She said, *once she
received disability*, she would "find housing and get the courts to
release her [seventeen year-old] daughter to her custody."

. . .

In early February 2003, the claimant told Ms. Anderson about
being verbally abused by her boyfriend; she also said he had taken
her key to their apartment from her. The claimant stated she had
gone to see her attorney "to be a little quicker in working on her
Disability (sic) claim." She stated that she "*stayed in his office
over 2 (sic) hours* in an attempt to get him to work on her claim"

17

(emphasis added).

. . .

Two weeks later, Ms. Anderson found the claimant in a "very good mood," as she reported she was dealing with her boyfriend by ignoring him. Ms. Anderson noted the claimant was "proactive in caring for herself and handling problems that would have normally stressed her out" before. She found the claimant was "very satisfied with herself in that she [wa]s trying to get a handle on her problems.

. . .

In October 2004, the claimant told Sarah Steele, another Centerstone therapist, she wanted to *get her GED, get her driver's license "back," and enroll her daughter in the Boys and Girls Club*.

In November 2004, the claimant told Ms. Steele she had joined a church and "volunteered for a fish fry." She also said she tried to "*run errands throughout the day and cleaned houses*" (emphasis added).

. . .

In late November 2005, the claimant told Melissa Porter, Psy.D., another Centerstone therapist, she had been hired to help clean houses . . . .

The claimant cancelled an appointment with Dr. Porter in February 2006. Then a month later, she told Dr. Porter she had a job interview. Dr. Porter also noted the claimant "ended the session quickly stating *she did not have anything to work on*" (emphasis added).

In May 2006, the claimant told Dr. Porter about the "positive changes she had made in her life and [her] plans for the future." Dr. Porter found the claimant had a euthymic mood and a broad affect.

. . .

18

In February 2007, the claimant told Ms. Varshney she had *gotten another job and was "feeling happy" about it*. She also expressed a desire to regain custody of her sixteen-year old daughter, who was under psychiatric care.

. . .

A week after that, the claimant told Ms. Varshney she had been *offered a second job, but she was not sure how to "fit her schedule accordingly"* (emphasis added). Ms. Varshney found the claimant was cheerful.

. . .

In July 2007, Ms. Varshney found the claimant was "euphoric" after she got a temporary job that would last two months . . . .

In October 2007, the claimant told Dr. Barrett she was still having problems with housing and finances. She said she "worked cleaning houses [and was] trying to get more than 2 (sic) regular customers." The claimant also stated she *could not "receive a paycheck [because] the state w[ould] garnish her wages"* for child support payments (emphasis added).

. . .

A few weeks later, the claimant told Ms. Edwards she had a part-time job cleaning at night, so she could pay child support to the state. She also *expressed resentment over having to do so*. The claimant said she went to friends' houses, the mall, or "other places to hang out during the day." Ms. Edwards encouraged her to get another job during the day.

. . .

In September 2008, Denise Reding, L.P.C., became the claimant's Centerstone therapist. Ms. Reding noted the claimant reported her mood as "overwhelmed"; she noted the claimant's affect was "somewhat smug and emotionally detached." The claimant complained about her "living situation." She said "she was not working because the *state would take child support out of her check*" (emphasis added).

Two weeks later, the claimant told Ms. Reding her mood was

19

"good." Ms. Reding found her affect was mood congruent with logical and linear thought processes, no usual [*sic*] thought content, and no suicidal or homicidal ideations . . . .

In early November 2008, the claimant told Ms. Reding she ended her relationship with her boyfriend since he was a "'negative force'" in her life and would not divorce his wife. She stated she had found strength in her religious beliefs. Ms. Reding found she appeared well and "motivated for change."

TR 500-06 (italics original)(internal citations omitted).

As can be seen, the ALJ thoroughly discussed and evaluated Plaintiff's Centerstone treatment notes, which reflect a lower level of impairment than Dr. Chang's February 2003 opinion.

Although Plaintiff argues that the ALJ did not provide the required "controlling weight" analysis or determine whether Dr. Chang's opinion was consistent with the "substantial evidence" of record, as can be seen in the quoted passages above, the ALJ's exhaustive discussion and analysis of the overall evidence of record demonstrates the contrary. The ALJ properly evaluated all of the evidence and found Dr. Chang's February 2003 Medical Source Statement of Ability to Do Work-Related Activities opinions inconsistent with, inter alia, his own treatment notes, Mr. Stair's December 2008 psychological examination findings, and Centerstone progress notes. The ALJ explained his rationale for according Dr. Chang's opinion "little weight," and that decision was properly supported by substantial evidence.

Additionally, Plaintiff contends that the ALJ erroneously placed too much weight on the fact that Plaintiff met with her attorney for two hours. The ALJ based his decision on the totality of the evidence, much of which has been explicitly recounted above. He did not base his decision

20

on the fact that Plaintiff met with her representative for two hours. The ALJ simply discussed that fact to demonstrate that it was inconsistent with Dr. Chang's opinion that Plaintiff had "no useful ability to maintain attention in two-hour segments." *See* TR 514.

Finally, Plaintiff asserts that the ALJ erroneously rejected Dr. Chang's opinion because of the GAF scores, but as has been demonstrated, the ALJ's detailed discussion illustrates that he based his decision on a thorough examination of all medical and testimonial evidence. The ALJ discussed the GAF scores assigned to Plaintiff by Dr. Chang simply to note that Dr. Chang's opinion was inconsistent with his rendered GAF scores. *See Id.* In fact, the ALJ attributed little weight to all the GAF scores of record explaining:

> The record contains many CRG forms and other assessments from the staffs of both Centerstone and MHC. They all are, however, considerably flawed. First, the assessments were usually inconsistent with the respective GAF scores. Second, sometimes the assessment would remain the same, yet the GAF would change significantly, if not dramatically; the reverse would also occur. Third, some assessments or parts of assessments had improper bases such as the claimant's own subjective report, references to one particular day, or the claimant being limited because she had not received disability benefits. Hence, all the CRG forms receive little weight.

TR 513-14 (internal citations omitted).

The ALJ explained that he discounted that which was inconsistent with the evidence of record. The ALJ's discounting of inconsistent evidence was proper, and within his province. In making his overall disability determination, the ALJ's decision demonstrates that he thoroughly evaluated all of the medical and testimonial evidence, reached a reasoned conclusion and explained the reasons therefore, and attributed proper weight to each opinion of record. Because

Dr. Chang's opinion was inconsistent with, and unsupported by, substantial evidence of record, the Regulations do not mandate that the ALJ accord Dr. Chang's evaluation controlling weight. Plaintiff's claim of error fails, as do her tangential claims that are predicated on this claim.[4]

## 2. Weight Accorded to the Opinion of Dr. Lakhani

Plaintiff likewise maintains that "[s]ubstantial evidence does not support the ALJ's residual functional capacity assessment, corresponding hypothetical questions to the vocational expert upon which the ALJ relied, adverse credibility finding, and step-five decision because the ALJ erroneously rejected treating psychiatrist Dr. Lakhani's April 2009 opinions." Docket No. 11 at 13-16. Plaintiff contends that the ALJ failed to evaluate whether "controlling weight" was owed to Dr. Lakhani's opinions, and improperly accorded Dr. Lakhani's opinion little weight because it was based upon MHC records. *Id.* Plaintiff also argues that the ALJ implicitly accorded little weight to Dr. Lakhani's opinions on the ground that she did not base her opinions on objective findings, when, in fact, she based her opinions on objective findings including abnormal affect, cognitive abnormalities, and abnormal psychomotor agitation or retardation. *Id.* Plaintiff additionally takes issue with the ALJ "rejecting" Dr. Lakhani's opinion because she based her assessment on a diagnosis of borderline intellectual functioning "versus" mild mental retardation when the ALJ himself ultimately found Plaintiff to have borderline intellectual

---

[4] As noted, the entirety of Plaintiff's argument on this point is: "Substantial evidence does not support the ALJ's residual functional capacity assessment, corresponding hypothetical questions to the vocational expert upon which the ALJ relied, adverse credibility finding, and step-five decision *because the ALJ erroneously rejected treating psychiatrist Dr. Chang's February 2003 opinions*." Docket No. 11 at 6 (emphasis added). Because the ALJ did not erroneously reject Dr. Chang's February 2003 opinions, that cannot serve as a basis for Plaintiff's tangential claims.

functioning. *Id.*

Defendant responds that the ALJ properly discussed and evaluated Dr. Lakhani's opinion within his thorough analysis of Plaintiff's medical evidence of record and found that it was inconsistent with the evidence as a whole. Docket No. 18 at 29-33. Defendant argues that the ALJ recognized Dr. Lakhani's limited treating relationship with Plaintiff, and noted that she seemed to base her assessment on MHC's records, Plaintiff's subjective complaints, or both. *Id.* Defendant also argues that the ALJ took issue with Dr. Lakhani's basing her assessment on a diagnosis of borderline intellectual functioning versus mental retardation because she admitted that she had no records upon which to base that decision, other than Plaintiff's own statements. *Id.*

In evaluating medical opinion evidence, the ALJ must follow the Regulations as stated above. The ALJ is required to give great weight to the opinion of a treating physician only if that opinion is supported by sufficient clinical findings and consistent with other evidence, and the ALJ can reject the opinion of a treating physician if he provides good reasons for so doing. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). For the reasons discussed below, the ALJ determined that Dr. Lakhani's opinion was inconsistent with the overall evidence of record, and he appropriately articulated his reasons for according it little weight.

The ALJ discussed Dr. Lakhani's records as follows:

> In late January 2009, the claimant started seeing Carmel Lakhani, M.D., [ADD FN - Plaintiff's date last insured is March 31, 2008 (TR 509), approximately ten months before she began treatment with Dr. Lakhani. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004)

23

(citation omitted).] another MHC psychiatrist, and reported being irritable and having problems with getting along with supervisors and coworkers. The claimant also said she could not follow "several step instructions." Dr. Lakhani only saw the claimant for fifteen minutes.

. . .

A week [after March 17, 2009], the claimant told Dr. Lakhani she continued to have the same problems with housing and finances. Again, Dr. Lakhani only saw claimant for fifteen minutes.

. . .

[In April 2009], Dr. Lakhani opined the claimant had no useful abilities to maintain attention and concentration for two-hour segments, to work in coordination with or proximity to others without being unduly distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, deal with normal work stress, to understand and remember detailed instructions, to carry out detailed instructions, to deal with stress of semiskilled or skilled work, and to interact appropriately with the general public. She also opined the claimant had seriously limited but not precluded abilities to remember more than simple work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to perform at a consistent pace without an unreasonable number and length of rest periods, to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, and to travel in unfamiliar places. Dr. Lakhani opined the claimant had satisfactory abilities to remember simple work-like procedures, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, to adhere to basic standards of neatness and cleanliness, or use public transportation.

TR 507-09 (internal citations omitted).

Explaining his rationale for according Dr. Lakhani's opinion little weight, the ALJ explained:

> Dr. Lakhani saw the claimant on only a few occasions over a period of a few months and for only fifteen minutes at a time. She seemed to be basing her assessment on MHC records, the claimant's subjective reporting, or both. Dr. Lakhani was also basing her assessment upon a diagnosis of borderline intellectual functioning versus mental retardation, even though she admitted she had no records to base that upon. Dr. Lakhani's assessment, therefore, receives little weight.

TR 514 (internal citations omitted).

Regarding his issue with Dr. Lakhani's "basing her assessment on MHC records" and/or Plaintiff's subjective reporting, the ALJ explained that the CRG assessments and other notes from MHC providers were inconsistent with the overall narrative of the progress notes, as well as with the extensive interview and testing administered by Mr. Stair. TR 513-14. The ALJ also discussed numerous reasons for his discrediting Plaintiff's subjective complaints. TR 512-13. The ALJ additionally took issue with Dr. Lakhani's admission that "she had no records" on which to base her opinion regarding Plaintiff's low I.Q. or reduced intellectual functioning. TR 514, 899. Because the ALJ determined that Dr. Lakhani had based part of her assessment on this diagnosis, which addmittedly did not have any objective support at the time, he could reasonably discount the assessment and use it as one reason to accord Dr. Lakhani's opinion little weight.

Additionally, Dr. Lakhani's opinion contradicts other substantial evidence of record upon which the ALJ relied in making his determination. As discussed above, Mr. Stair's psychological examination contradicted Dr. Lakhani's limited findings, and as did Plaintiff's Centerstone

25

records and activities of daily living. The ALJ observed:

> When Mr. Stair asked her what she did during the day, the claimant initially said, other than taking her daughter to school, she would "just sit at home." Then she said she would have to "go out and do something." The latter statement is more credible than the former because the record contains several instances of the claimant doing much more than staying at home. Dr. Chang told her in March 2004 "not to do everything for everyone." A few months later, she told Dr. Chang she was trying to work odd jobs and want[ed] to obtain her GED...[which] actually help[ed] her feel better as she [wa]s able to get out more often." In September 2004, the claimant told Dr. Chang she was "[t]rying to engage in more activities [such as] visiting the sick and shut-ins and helping them." A month later, she told Ms. Steele she wanted to [get] her GED, get her driver's license "back," and enroll her daughter in the Boys and Girls Club. A month after that, the claimant told Ms. Steele she had joined a church and "volunteered for a fish fry." She also said she tried to "run errands throughout the day and cleaned houses." In late February 2007, after she had already gotten one job, the claimant told Ms. Varshney she had been offered a second job, but she was not sure how to "fit her schedule accordingly." Unfortunately, the claimant has had persistent problems with housing and finances, but she has persistently tried to solve both problems albeit with only temporary success.

TR 513.

Although Dr. Lakhani was one of Plaintiff's MHC care providers, Dr. Lakhani's opinion contradicts other substantial evidence in the record. Accordingly, the Regulations do not require the ALJ to give controlling weight to her opinion (*see* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2)), and Plaintiff's argument fails.

### 3. Weight Accorded to the Opinion of Plaintiff's Therapist

Plaintiff maintains that the ALJ erred in finding that Ms. Reding's opinion was inconsistent with the medical evidence, because he did not cite any medical evidence that he

26

alleged to be inconsistent. Docket No. 11 at 12. Plaintiff argues that the ALJ erroneously relied

on "several instances" where Ms. Reding noted that Plaintiff had been "doing well," and on the

"scintilla of evidence" that Plaintiff had missed several appointments with Ms. Reding. *Id.*

Defendant responds that the ALJ properly considered Ms. Reding's April 2009 opinion

and found it to be inconsistent with the evidence of record, including with Ms. Reding's own

treatment notes, the assessments of two consultative examiners and DDS consultant, Plaintiff's

reported activities of daily living, and her own limited, conservative nature of treatment for

Plaintiff. Docket No. 18 at 27-29.

Although a therapist is not among the acceptable medical sources enumerated in 20 CFR

404.1513(a), the Regulations provide that the ALJ may properly:

> "use evidence from other sources to show the severity of your
> impairment(s) and how it affects your ability to work. Other
> sources include, but are not limited to -
>
> (1) Medical Sources not listed in paragraph (a) of this section (for
> example, nurse-practitioners, physicians' assistants, naturopaths,
> chiropractors, audiologists, and therapists).

20 CFR 404.1513(d).

The ALJ specifically addressed Ms. Reding's notes in his decision, stating:

> In September 2008,[5] Denise Reding, L.P.C., became the claimant's
> Centerstone therapist. Ms. Reding noted the claimant reported her
> mood as "overwhelmed"; she noted the claimant's affect was

_____

[5] Plaintiff's date last insured is March 31, 2008 (TR 509), approximately five months
before she began treatment with Ms. Reding. "Evidence of disability obtained after the
expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88
Fed. Appx. 841, 845 (6th Cir. 2004) (citation omitted).

"somewhat smug and emotionally detached." The claimant complained about her "living situation." She said "she was not working because *the state would take child support out of her check*" (emphasis added).

Two weeks later, the claimant told Ms. Reding her mood was "good." Ms. Reding found her affect was mood congruent with logical and linear thought processes, no usual [*sic*] thought content, and no suicidal or homicidal ideations. The claimant's boyfriend also attended and expressed "a high level of commitment" to the claimant and her ten-year old daughter.

. . .

In early November 2008, the claimant told Ms. Reding she ended her relationship with her boyfriend since he was a "'negative force'" in her life and would not divorce his wife. She stated she had found strength in her religious beliefs. Ms. Reding found she appeared well and "motivated for change."

. . .

Over the next few months, the claimant continued to complain about her aunt to Ms. Reding, who found she had a euthymic mood or affect. The claimant also failed to keep or cancelled several appointments.

. . .

In February 2009, the claimant reported worsening symptoms including suicidal ideations to Ms. Reding. Two weeks later, she reported feeling better, although still having a depressed mood. She complained about her boyfriend, the way he treated her, and his refusal to divorce his wife. Several weeks later, Ms. Reding noted the claimant had a euthymic mood after her boyfriend agreed to divorce his wife.

[Around April 2009] Ms. Reding opined the claimant had no useful abilities to remember work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to maintain attention and concentration for two-hour segments, to work in coordination with or proximity to others without being unduly distracted, to complete a normal workday and workweek without interruptions from

28

psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, to deal with normal work stress, to understand and remember detailed instructions, to carry out detailed instructions, to set realistic goals or make plans independently of others, and deal with stress of semiskilled or skilled work. She opined the claimant had seriously limited but not precluded abilities to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, to interact appropriately with the general public, and to maintain socially appropriate behavior. Ms. Reding opined the claimant had satisfactory abilities to adhere to basic standards of neatness and cleanliness and to use public transportation.

TR 505-09 (italics original)(internal citations omitted)(footnote added).

Explaining the weight accorded to Ms. Reding's opinion and the reasons therefore, the ALJ stated:

Ms. Reding's assessment is inconsistent with the medical evidence, which contains several instances where she thought the claimant was doing well. The claimant also *failed to keep several appointments* with her. Thus, Ms. Reding's assessment receives little weight.

TR 514 (italics original).

As discussed above, the ALJ, in his decision, thoroughly discussed the medical and testimonial evidence of record, much of which contradicts Ms. Reding's limited findings from April 2009. The ALJ also noted that Ms. Reding's April 2009 assessment of Plaintiff's limitations was inconsistent with the narrative of her progress treatment notes. Because Ms.

Reding's April 2009 opinions were inconsistent with her progress treatment notes, other evidence of record, and Plaintiff's reported activities of daily living, the ALJ was to bound to accept them, and the ALJ could properly accord them little weight. Accordingly, Plaintiff's argument fails.

### 4. Plaintiff's Ability to Work Full-Time

Plaintiff maintains that since she cannot work full-time, the ALJ should have found that she is disabled. Docket No. 11 at 7. Defendant responds that the ALJ properly conducted the requisite five-step sequential evaluation process, and appropriately determined that Plaintiff was not disabled. Docket No. 18. Defendant argues that the ALJ's disability determination was supported by substantial evidence and should stand. *Id.*

In determining residual functional capacity for purposes of the analysis required at steps four and five, the Commissioner is required to determine Plaintiff's capacity for work activity on a "regular and continuing basis." *See* SSR 96-8p. The Regulations define "regular and continuing basis" as "8 hours a day for 5 days a week, or an equivalent work schedule." *Id.*

In the case at bar, the ALJ found that Plaintiff retained the residual functional capacity to perform work on a regular and continuing basis. Other than her arguments analyzed and discounted above, Plaintiff does not point to any objective medical evidence in the record to support her contention that she cannot work full-time. Additionally, as has been demonstrated throughout the statements of error above, the record is replete with doctors' evaluations, medical assessments, and test results, all of which were properly considered by the ALJ in determining Plaintiff's "residual functional capacity for work activity on a regular and continuing basis." After evaluating all of the objective medical evidence of record and Plaintiff's reported level of

30

activity, the ALJ determined that Plaintiff retained the residual functional capacity to:

> perform a full range of work at all exertional levels that is limited by understanding, remembering, and carrying out only short and simple instructions; making judgments on simple work-related decisions; having occasional contact with the public, supervisors, and co-workers; and avoiding any production-rate pace work or work that requires any changes in work requirements or procedures.

TR 511.

The ALJ properly evaluated the evidence of record in reaching this residual functional capacity determination, and the Regulations do not require more. The ALJ reached a reasoned decision and articulated his rationale for that decision; his determination that Plaintiff could perform work on a regular and continuing basis (and was therefore not disabled) was supported by substantial evidence, and Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of

31

service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


E. CLIFTON KNOWLES

United States Magistrate Judge

Case 3:11-cv-00651   Document 19   Filed 04/15/13   Page 32 of 32 PageID #: 1085