IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROSIE M. SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:11-cv-00651 |
| ) | Judge Nixon |
| CAROLYN W. COLVIN, ) | Magistrate Judge Knowles |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Pending before the Court is Plaintiff Rosie M. Smith's Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 10), filed with a Brief in Support (Doc. No. 11). Defendant Commissioner of Social Security ("Commissioner") filed a Response opposing the Motion. (Doc. No. 18.) Magistrate Judge Knowles subsequently issued a Report and Recommendation ("Report"), recommending that Plaintiff's Motion be denied and the final decision of the Commissioner be affirmed. (Doc. No. 19 at 31.) Plaintiff filed an Objection to the Report ("Objection"). (Doc. No. 20.) Upon review of the Report and the Record, the Court **ADOPTS** the Report, **DENIES** Plaintiff's Motion, and **AFFIRMS** the decision of the Commissioner.

I.  BACKGROUND

  *A. Procedural Background*

Plaintiff applied for Title XVI Supplemental Security Income ("SSI") and Title II Disability Insurance Benefits ("DIB") on September 6, 2001, alleging an onset date of September 3, 2001. (Tr. 18.) Plaintiff alleged disability due to depression, mental retardation,

1

and headaches. (Tr. 425.) The Social Security Administration ("SSA") denied both claims, first on December 7, 2001, and again upon reconsideration on March 8, 2002. (Tr. 30–33.) Plaintiff was appointed counsel on January 10, 2002, (Tr. 28) and the SSA received Plaintiff's timely Request for Hearing by an Administrative Law Judge on April 11, 2002. (Tr. 43.) Administrative Law Judge ("ALJ") Mack H. Cherry presided over the hearing on October 29, 2003, during which Plaintiff appeared with counsel and gave testimony, as did Jane Brenton, an impartial vocational expert ("VE"). (Tr. 440.) ALJ Cherry issued an unfavorable decision on July 16, 2004. (Tr. 15–25.) Plaintiff sought review of ALJ Cherry's decision on August 23, 2004. (Tr. 13–14.) The Social Security Appeals Council denied Plaintiff's request for review of ALJ Cherry's decision on April 18, 2005, rendering the denial the final decision of the Commissioner. (Tr. 5.)

Plaintiff filed suit in this Court pursuant to 42 U.S.C. § 405(g), and Judge Griffin issued the Report on March 27, 2008, recommending that Plaintiff's motion be denied on March 27, 2008. (Tr. 568–605.) Plaintiff filed timely objections to Judge Griffin's Report, and this Court remanded the case to the Commissioner for further proceedings. (Tr. 525–553.) The Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ on August 4, 2008. (Tr. 608.) ALJ Donald Garrison presided over the hearing on April 9, 2009, during which Plaintiff appeared with counsel and testified, again along with VE Brenton. (Tr. 912–934.)

ALJ Garrison issued an unfavorable decision on July 31, 2009, making the following enumerated findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2. The claimant has not engaged in substantial gainful activity since September 3, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant's "severe" impairments have been a depressive disorder, not otherwise specified; an anxiety disorder, not otherwise specified; and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. The claimant can perform a full range of work at all exertional levels that is limited by understanding, remembering, and carrying out only short and simple instructions; making judgments on simple work-related decisions; having occasional contact with the public, supervisors, and co-workers; and avoiding any production-rate pace work or work that requires any changes in work requirements or procedures.

6. The claimant cannot perform any past relevant work (20 CFR 404.1565 and 416.965).

7. As she was born on November 4, 1966, the claimant was 34 years old, which is defined as a younger individual not younger than eighteen or older than forty-four, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has no significant literacy skills but can communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering her age, education, work experience, and residual functional capacity, no jobs that the claimant could perform have existed in significant numbers in the national economy (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

(Tr. 509–16.)

On August 7, 2009, Plaintiff filed a request for review of the ALJ's decision. (Tr. 491–92.) The Appeals Council found no reason to assume jurisdiction, making the ALJ's decision

the final decision of the Commissioner. (Tr. 478–80.) Plaintiff filed this action on July 6, 2011, seeking judicial review of the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). (Doc. No. 1.)

Pursuant to Judge Knowles's October 4, 2011, order (Doc. No. 5), Plaintiff filed a Motion for Judgment on the Record (Doc. No. 10) with a Brief in Support (Doc. No. 11) on January 9, 2012. Defendant responded on May 1, 2012 (Doc. No. 18), and Judge Knowles issued his Report recommending that Plaintiff's Motion be denied on April 15, 2013. (Doc. No. 19). On May 2, 2013, Plaintiff asserted two objections to the Report. (Doc. No. 20.) Specifically, Plaintiff objects to Judge Knowles's recommendation that the Court affirm ALJ Garrison's evaluation of both treating physicians, Dr. Chang and Dr. Lakhani. (*Id.* at 2–12.) The Court now reviews Judge Knowles's Report, considering Plaintiff's Objection.

### B. *Factual Background*

Plaintiff was born on November 4, 1966, and was forty-two years old at the time of the hearing with ALJ Garrison. (Tr. 19, 914.) On the alleged disability onset date of September 3, 2001, Plaintiff was thirty-four years old and defined under federal regulations as a "younger individual not younger than eighteen or older than forty-four." (Tr. 18, 515.) Plaintiff alleges disability based on a learning disability and "swaying moods," and testified that there was nothing special about her alleged onset date, just that at that time it was "too much" to take care of her children and mother. (Tr. 447–49.) Plaintiff completed the eleventh grade, in special education classes (Tr. 19, 914), and her past relevant work primarily includes housekeeping at hotels and restaurant work (Tr. 86, 913).

1. Medical Evidence

On November 1, 2001, William O'Brien, Psy.D., performed a psychiatric examination on Plaintiff, on behalf of Tennessee Disability Determination Services. (Tr. 159–63.) Dr. O'Brien opined that Plaintiff's mood was euthymic, her speech was fluent, and her thought process was organized. (Tr. 161.) Dr. O'Brien assigned Plaintiff a Full Scale IQ Score of 61 and referred Plaintiff for an assessment to determine whether she was exaggerating her symptoms, noting that she had provided inconsistent information and did not appear to put forth sufficient effort in carrying out intellectual tasks. (Tr. 163.)

On December 6, 2001, Victor O'Bryan, Ph.D., conducted a Mental Residual Functional Capacity ("RFC") Assessment and found Plaintiff had mild restrictions in activities of daily living; moderate difficulty in maintaining social functioning, concentration, persistence and pace; and no episodes of extended decompensation. (Tr. 164–178.) Dr. O'Bryan diagnosed Plaintiff with depressive disorder and probable borderline intellectual functioning. (Tr. 171–72.) As Plaintiff simultaneously received treatment at both the Mental Health Cooperative and Centerstone Community Health Center, for the sake of clarity the Court presents her treatment history by treating facility.

i. Treatment at the Mental Health Cooperative

Plaintiff began seeking psychiatric treatment at the Mental Health Cooperative ("MHC") for depression in February 2002. (Tr. 220.) Plaintiff complained of visual hallucinations, decreased appetite, difficulty concentrating, poor motivation, and passive suicidal ideation. (*Id.*) Nurse Sherrill Green reported that Plaintiff's mood was depressed, but that she was alert and fully-oriented. (Tr. 222.) Ms. Green diagnosed Plaintiff with major depressive disorder,

assigned her a Global Assessment Functioning (GAF)[1] score of 55, and prescribed Celexa and Zyprexa. (*Id.*) At her follow-up appointment on March 1, 2002, Plaintiff reported overall improvement on her medication and a good appetite and sleep habits. (Tr. 217.) Throughout the spring of 2002, Plaintiff complained of migraines and interrupted sleep; however, by that summer she reported significant improvement with her medication and "no overt signs or symptoms of depression," but also reported increased anxiety and worry. (Tr. 210–216.) On August 26, 2002, Plaintiff denied any problems other than concern about hair loss. (Tr. 209.)

On September 6, 2002, Plaintiff successfully completed the Family Services Counseling ("FSC") Program to increase her coping skills, which she described as a "ten" on a scale of zero to ten upon completion. (Tr. 332–33.) During this program, Plaintiff reported that, despite needing "to get [her] life together," she was a good parent, got along well with co-workers, enjoyed working, was a hard worker, and was mostly satisfied with life. (Tr. 358–59.) However, Plaintiff's vocational rehabilitation counselor informer her FSC Counselor, Michelle Bennett, that Plaintiff was ineligible for vocational rehabilitation due to "psychological test results and the issue of malingering." (Tr. 372.)

Plaintiff returned to MHC on September 27, 2002, stating she felt "like I'm gonna snap." (Tr. 208.) Dr. Rudra Prakash increased Plaintiff's Celexa dosage on that date, and again on October 25, 2002, in response to Plaintiff's increased stress and anxiety. (Tr. 207–08.) On

---

[1] The Global Assessment of Functioning test is a subjective determination that represents the "clinician's judgment of the individual's overall level of functioning." *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 924 n. 1 (E.D. Mich. 2005) (*citing* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994)). The score ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF score of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

December 11, 2002, Plaintiff saw David Chang, M.D., at MHC and reported being miserable with suicidal ideation and plans to use a knife or gun. (Tr. 206.) On January 8, 2003, Plaintiff again saw Dr. Chang and complained of difficulty falling asleep, crying spells, and hopelessness. (Tr. 205.) During this visit, she requested Dr. Chang write her a letter for her disability application. (*Id.*) Plaintiff continued to complain of difficulty sleeping, hallucinations of her deceased mother, suicidal ideation with no plan, irritability, and difficulty obtaining disability in February and March 2003. (Tr. 199–200, 202.)

On February 5, 2003, Dr. Chang completed a Medical Source Statement stating Plaintiff had major depressive disorder, severe financial and family issues, and a GAF of 55. (Tr. 183.) However, he also opined that Plaintiff did not have a low IQ or reduced intellectual functioning. (Tr. 184.) He noted that Plaintiff had moderate limitations in her activities of daily living and marked difficulties maintaining social functioning and concentration, persistence, or pace, resulting in failure to complete tasks in a timely manner. (Tr. 186.)

On March 5, 2003, Plaintiff continued to complain of irritability and anger, but Dr. Chang described her as "bright and interactive." (Tr. 200.) On April 2, 2003, Plaintiff's mood was "down but stable," and Dr. Chang noted that she was looking for odd jobs. (Tr. 197.) Between June 9 and September 3, 2003, Plaintiff continued reporting anxiety-related sleep issues and visual and auditory hallucinations, as well as stating she disliked being around people and was "fed up." (Tr. 190, 235–38.) Dr. Chang noted inconsistencies in Plaintiff's reports about her sleeping patterns. (Tr. 236.) He also reported that Plaintiff was going for walks and visiting her friends, but not applying for jobs. (*Id.*) After Plaintiff's boyfriend died on September 4, 2003, she reported having difficulty coping with the loss and increased hallucinations. (Tr. 234.) On October 15, 2003, she reported short-term memory problems and mood swings. (Tr. 231.)

On June 7, 2004, Plaintiff told Dr. Chang she was ready to "give up" but also reported that she had been cleaning houses to make ends meet. (Tr. 673.) Plaintiff stated that her situation was getting worse because of her finances, but that being up and about for work was making her feel somewhat better. (*Id.*) In July 2004, Plaintiff reported that she was having stress migraines, was easily frustrated, and often cried. (Tr. 672.) However, by September 2004, she reported that she was trying to engage in more activities and was considering looking for work. (Tr. 671.) Dr. Chang reported her appearance as "more upbeat and brighter." (*Id.*) By January 2005, Plaintiff reported that she was still frustrated, but that her depression had improved some and that she was working part-time cleaning houses, not waiting for disability, and "ready to live life." (Tr. 669.)

> ii. Treatment at Centerstone Community Mental Health

In September of 2002, Plaintiff also began counseling at Centerstone Community Mental Health Centers. (Tr. 242, 244.) Plaintiff reported being sexually abused by her aunt's boyfriend at age 12 and suffering from depression and schizophrenia. (Tr. 329.) Over the course of her therapy at Centerstone, Plaintiff complained about her abusive boyfriend, financial stress, worries about her court appearances, worries about obtaining disability benefits, and difficulty concentrating. (Tr. 269–329.) However, on December 8, 2003, Plaintiff reported she was "doing much better not focusing on the bad things in her life" and finding strength in her faith in God and prayer. (Tr. 416.)

In October 2004, therapist Sarah Steele, M.S., reported improvements in Plaintiff's mood and noted that Plaintiff showed interest in wanting to obtain her GED, get her driver's license back, and enroll her daughter in the Boys and Girls Club. (Tr. 655–56.) On November 3, 2004, Plaintiff told Ms. Steele that she had been awarded child support, had called the Boys and

Girls Club, and had started activities including exercise, going to church and volunteering. (Tr. 653.) In 2005, Plaintiff reported to Ms. Steele at Centerstone that, although she still had concerns about her family, she was continuing to go to church and meet people. (Tr. 643.)

In March of 2006, Plaintiff met with Melissa Porter, Psy.D., M.A. and reported that she had moved away from her abusive boyfriend and in with another family, that she had scheduled a job interview, and had concluded that she "did not have anything to work on" in therapy. (Tr. 855.) Throughout the spring and summer of 2006, Plaintiff continued to discuss the positive changes she had made in her life: moving into her own apartment, cleaning apartments for half the rent money, and improving her relationship with her children. (Tr. 848.) Beginning in October 2006, Plaintiff began seeing therapist Swati Varshney, M.A., and reported some suicidal ideation that she stated she would not act on for the sake of her 8-year-old daughter. (Tr. 841.) Plaintiff lost her cleaning job in December 2006 but was motivated to seek another job. (Tr. 830–31.) In early 2007, Plaintiff "appeared cheerful" and had been offered a second job. (Tr. 822.) Though she had been diagnosed with hypertension, she stated she was happy to be independent and was motivated to work to afford her own place. (*Id.*) However, by March 2007, Plaintiff was stressed about housing again, and by that summer, was living in a hotel. (Tr. 816–20.)

In September 2007, she began therapy with Deidrah Edwards, M.S. (Tr. 805.) By November 2007, Plaintiff was living with her aunt and stated she continued to have conflicts with her older children, which she escaped by going to friends' houses, the mall, or other places during the day and working a part-time cleaning job at night. (Tr. 801.) Ms. Edwards noted that Plaintiff refused to take on more hours at work even though she was consistently stressed about her finances and concluded that Plaintiff "has an attitude of entitlement." (Tr. 798.) By spring

9

2008, Ms. Edwards noted that Plaintiff used therapy to vent her problems but was resistant to actual change. (Tr. 790.) Ms. Edwards subsequently determined that she needed to work on Plaintiff's attitude that "someone always needs to do something for her." (Tr. 786–87.)

In September 2008, Plaintiff began seeing Denise Reding, LPC-MHSP, and started regularly making "substantial progress." (Tr. 768–72.) Ms. Reding found Plaintiff to be alert and fully oriented, with logical and linear thought processes and no perceptual distortion. (Tr. 769.) Ms. Reding noted, however, that Plaintiff was still stressed about her aunt, money, and her boyfriend. (*Id.*) During this time Plaintiff was also being seen at MHC with similar reports. (Tr. 678–93.)

### iii. Disability Examinations

On December 27, 2008, Arthur Stair, III, M.A., LPE, completed a consultative examination on behalf of Tennessee Disability Determination Services. (Tr. 694–700.) Mr. Stair diagnosed Plaintiff with mild anxiety and mild-to-moderate situational depressed affect. (Tr. 696.) Mr. Stair opined that Plaintiff was within the borderline intellectual function range and "relatively well-suited for a wide range of simple repetitive tasks," though she may have difficulty keeping up in fast-paced jobs. (*Id.*) Mr. Stair further opined that Plaintiff "appears to be attempting to present herself as being of lower intelligence than she really is," and reported her achievement scores as the lowest possible standard score. (*Id.*) Plaintiff reported that she took her daughter to school, tried to learn new things, walked, listened to music and attended Bible classes. (Tr. 697.)

On April 22, 2009, Carmel Lakhani, M.D., of MHC completed a Medical Source Statement of Ability to Do Work-Related Activities, in which she opined that Plaintiff had moderate restrictions in activities of daily living; marked difficulties maintaining social

10

functioning; constant difficulties maintaining concentration, persistence, or pace; and four or more episodes of deterioration in the prior six months. (Tr. 898–99.) On April 27, 2009, Ms. Reding completed another Medical Source Statement opining that Plaintiff had severe depression and perceptual distortions. (Tr. 904.) Ms. Reding found Plaintiff had poor mental abilities to do most aspects of unskilled work, and supported those findings with clinical findings of severe depression. (Tr. 906.)

### 2. Testimonial Evidence

Plaintiff appeared and gave testimony at hearings in front of ALJ Cherry on October 29, 2003, and in front of ALJ Garrison on April 9, 2009. (Tr. 440–77, 910–34.)

At the initial hearing, Plaintiff testified that, although she had completed the eleventh grade in special education classes, she could only read at a third grade level and required assistance to pay her bills or make change from a dollar. (Tr. 445–46.) She complained that the side effects of her medication sometimes made her sleep all day, but also that she did not ever sleep. (Tr. 449.) Plaintiff testified that the main problem she had was a learning disability, but that her medication kept her on task and that she did her own house cleaning. (Tr. 448–50.) Plaintiff stated that she had visions of her dead mother and dead boyfriend talking to her (Tr. 450), and that she didn't like to be around people (Tr. 451–53). She stated that, though she had not been hospitalized for mental illness, she had experienced suicidal thoughts. (Tr. 455.)

Plaintiff's friend, Susan Hannah, appeared and testified before ALJ Cherry that she had been financially assisting Plaintiff and Plaintiff's daughter, Brittany. (Tr. 464.) VE Jane Brenton then testified that Plaintiff would be able to resume her housekeeping position, even accounting for moderate limitations in: maintaining attention and concentration, dealing with the public, working around co-workers without being distracted, adapting to changes in the work

11

environment, and completing a work day without distractions; and marked limitations in: understanding, remembering, and carrying out details. (Tr. 474–76.)

After this Court remanded her case to be heard before an independent ALJ (Case No. 3:05-cv-00478, Doc. No. 21), Plaintiff had a second hearing before ALJ Garrison on April 9, 2009 (Tr. 912). Plaintiff testified initially that she had not worked or tried to work anywhere since September 2001, but upon the interjection of her attorney, admitted that she had done part-time housekeeping work. (Tr. 915–17.) She testified again that her medication helps with mood swings and that she takes it as prescribed. (Tr. 918.) Plaintiff further testified that she did not believe she was making progress in her mental health therapy and that her nerves and sleep issues currently prevent her from working as a housekeeper. (Tr. 919, 921.)

VE Brenton again testified that, even with the majority of limitations discussed,[2] Plaintiff would be able to resume her past work as a housekeeper. (Tr. 926–27.) However, if an additional limitation of only having occasional contact with co-workers and supervisors was considered, no such work would be available. (*Id.*) VE Brenton further testified, though, that even with all of the restrictions posed, including a GAF score in the 51 to 60 range and lack of literacy, Plaintiff would be able to work as (1) an inspector at the light level, (2) a machine operator, or (3) an assembler. (Tr. 927.) However, if Plaintiff's testimony was fully credible, VE Brenton testified that no work would be available. (Tr. 928.)

---

[2] Specifically, ALJ Garrison requested VE Brenton to consider the limitations of: "able to understand, remember, and carry out only short, simple instructions; make judgments only on simple, work-related decisions; . . . occasional interaction with the public; [and] no production-rate paced jobs or jobs with changing work procedures or requirements. (Tr. 926.)

## II. STANDARD OF REVIEW

The Court's review of the Report is *de novo*. 28 U.S.C. § 636(b) (2012). This review, however, is limited to "a determination of whether substantial evidence exists in the record to support the [Commissioner's] decision and to a review for any legal errors." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (2012). Accordingly, the reviewing court will uphold the ALJ's decision if it is supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" is a term of art and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison Co.*, 305 U.S. at 229).

"Where substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc)). This standard of review is consistent with the well-settled rule that the reviewing court in a disability hearing appeal is not to weigh the evidence or make credibility determinations, because these factual determinations are left to the ALJ and to the Commissioner. *Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1993); *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). Thus, even if a court would have come to different factual conclusions as to a

plaintiff's claim on the merits than those of the ALJ, the Commissioner's findings must be affirmed if they are supported by substantial evidence. *Hogg*, 987 F.2d at 331.

### III. PLAINTIFF'S OBJECTIONS TO JUDGE KNOWLES'S REPORT

Plaintiff raises two objections to Judge Knowles's Report. She objects to Judge Knowles's recommendations to both affirm ALJ Garrison's evaluation of treating psychiatrist Dr. Chang's opinions (Doc. No. 20 at 2–9) and affirm ALJ Garrison's evaluation of treating psychiatrist Dr. Lakhani's opinions (*id.* at 9–12).

The SSA has developed a five-step sequential process for the ALJ to use in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013). The first step requires the ALJ to determine whether the claimant is engaging in "substantial gainful activity." *Id.* In the second step the ALJ determines whether the claimant has a "medically determinable impairment that is 'severe' or a combination of impairments that is 'severe'" and is expected to result in death or last for at least one year. *Id.* §§ 404.1509, 404.1520(c), 416.920(c).

Step three requires the ALJ to determine whether the claimant's impairments meet or medically equal one of the impairments listed in the controlling SSA regulation. *Id.* Pt. 404, Subpt. P, App. 1. The ALJ uses the description of the mental impairment in question, which consists of categories labeled "A," "B," and "C," to evaluate whether the claimant has that medically determinable impairment. *Id.* § 12.00. The ALJ must first evaluate the "A" criteria, consisting of "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* Then, the ALJ must evaluate the "B" criteria, which rate the claimant's degree of limitation in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation (temporary increases in symptoms resulting in loss of function). *Id.* If the claimant does not suffer from

14

"marked" ("more than moderate but less than extreme") functional limitation according to the "B" criteria, the ALJ must assess the "C" criteria, which provide additional guidelines for evaluating impairment-related functional limitations that are incompatible with the ability to do any gainful activity. *Id.* A claimant is deemed to have a recognized mental impairment if his medical record satisfies the criteria of one of the enumerated mental impairments. *Id.*

The fourth and fifth steps require the ALJ to inquire into the claimant's RFC: his ability to do mental and physical work on a sustained basis despite his limitations, and to determine the claimant's ability to do past relevant work or other relevant work. 20 C.F.R. §§ 404.1520(a), 416.920(a).

Here, in denying Plaintiff's claim for benefits, ALJ Garrison found at the third step that Plaintiff's mental impairments do not meet or medically equal one of the listed impairment in the SSA regulations. (Tr. 510.) He considered the four functional "B" criteria of mental disorders as set out in 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.05 and 12.06 ("D" criteria of listing 12.05), and found that Plaintiff has only mild restrictions in her activities of daily living, moderate difficulties maintaining social functioning and maintaining concentration, and no episodes of decompensation of extended duration. (*Id.*) The ALJ further found that the evidence also failed to establish the "C" criteria for all relevant listings. (Tr. 510–511.)

At steps four and five, ALJ Garrison found Plaintiff capable of making a successful adjustment to other work that exists in significant numbers in the national economy, as recommended by the VE. (Tr. 516.)

    *A.*    *Plaintiff's Objection to ALJ Garrison's Evaluation of Dr. Chang's Opinions*

Plaintiff objects to Judge Knowles's finding that ALJ Garrison properly evaluated treating psychiatrist Dr. Chang's opinions. She first argues that ALJ Garrison failed to determine

15

whether Dr. Chang's opinions were consistent with substantial evidence in the record and improperly relied on Plaintiff's GAF scores. (Doc. No. 20 at 2–5.) Plaintiff continues that, contrary to the Report, ALJ Garrison did not give good reasons for according little weight to Dr. Chang's opinions, and that all these mistakes led to an erroneous determination that the opinions were not owed controlling weight. (*Id.* at 5–7.) Plaintiff's second argument is that ALJ Garrison improperly relied on her ability to meet with her attorney for two hours as evidence of non-disability. (*Id.* at 5.) Plaintiff lastly argues that, assuming ALJ Garrison erroneously gave too little weight to Dr. Chang's opinions, that error would be harmful. (Doc. No. 20 at 9.)

1. Weight Given to Dr. Chang's Opinions

To determine the weight to accord a physician's opinion, the ALJ must consider many factors, including: the physician's examining relationship with the claimant, the length of the treatment relationship and frequency of examinations, the nature and extent of treatment relationship, the supportability of the physician's opinion, the specialization of the physician, and other factors the claimant brings to the ALJ's attention. 20 C.F.R. § 404.1527(c). A physician will be deemed a "treating source" if he has provided the claimant with medical treatment or evaluation and has had an ongoing treatment relationship with the claimant, seeing the claimant with a frequency consistent with accepted medical practice for the condition treated. *Id.* § 404.1502.

Treating sources are given controlling weight when their opinion are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with other evidence in the record. *Id.* However, the Sixth Circuit has held that an ALJ may properly reject the opinion of a treating physician on finding that the opinion is "'inconsistent with the other substantial evidence in the case record,'" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877

16

(6th Cir. 2007) (quoting 20 C.F.R. § 404.1527(d)(2)), or not sufficiently supported by medical evidence, *e.g.*, *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006).

Plaintiff first argues that ALJ Garrison violated this Court's order and the "law of the case" by failing to determine whether Dr. Chang's opinions were consistent with substantial evidence in the record, as the ordered by the Court. (Doc. No. 20 at 2–3.) Plaintiff goes on to argue that, contrary to Judge Knowles's Report, the ALJ did not give "good reasons" for according little weight to Dr. Chang's opinions. (*Id.* at 7–8.)

In his opinion, ALJ Garrison stated:

> Dr. Chang's opinion was inconsistent with his GAF score both at that time (55, or moderate symptoms) and over the previous year (60, or moderate, though almost mild, symptoms). His assessment was also inconsistent with the medical evidence. For example, Dr. Chang opined the claimant had no useful ability to deal with the general public. A few days earlier, however, the claimant told Ms. Anderson she had spent two hours in her attorney's office trying to get him to work on her case. Dr. Chang found the claimant had a moderate restriction in her ability to perform her activities of daily living, yet the claimant told Dr. O'Brien just a few months earlier she performed all her activities of daily living. Finally, Dr. Chang had only seen the claimant a few times for fifteen minutes each time over the course of a few months when he made his assessment. Dr. Chang's assessment, therefore, receives little weight.

(Tr. 514.) ALJ Garrison also relied on medical evidence from Mr. Stair, who "administered a thorough battery of tests unmatched by any other source." (Tr. 514.) ALJ Garrison detailed exactly how Dr. Chang's assessment was inconsistent with the overall evidence, and explained what evidence supported his decision to attribute little weight to Dr. Chang's opinion. (*Id.*) Though it is undisputed that Dr. Chang is a treating source, the Court finds ALJ Garrison adequately supported his determination that Dr. Chang's opinions were inconsistent with other evidence in the record. As Judge Knowles detailed in his Report (Doc. No. 19 at 14–20), the Court finds substantial evidence in the record supports ALJ Garrison's finding that Dr. Chang's

17

opinions were inconsistent with other substantial evidence in the record, and that these findings were "good reasons" to accord little weight to Dr. Chang's opinions.

Next, Plaintiff objects that the ALJ violated this Court's order by improperly rejecting Dr. Chang's opinions based on Plaintiff's GAF scores. (Doc. No. 20 at 4–5.) However, as discussed above, the ALJ did not base his treatment of Dr. Chang's opinions primarily on GAF scores, but on the inconsistency between Dr. Chang's opinions and the record as a whole. (Tr. 514.) Thus, Plaintiff misconstrues the importance of Dr. Chang's GAF scores to the ALJ's decision to attribute Dr. Chang's opinions little weight.

### 2. Weight Given to Plaintiff's Meeting with her Attorney

Next, Plaintiff objects to the ALJ's "reliance" on the fact that Plaintiff met with her attorney for two hours, arguing that her ability to do so is not evidence of non-disability. (Doc. No. 20 at 5–6.) However, the ALJ did not "rely" on this evidence at all, and did not premise his finding Plaintiff not disabled on this meeting. Instead, the Court finds ALJ Garrison properly used Plaintiff's meeting with her attorney as evidence in conflict with Dr. Chang's assessment that Plaintiff had "no useful ability to maintain attention in two-hour segments." (Tr. 514.)

### 3. Risk of Harm

Finally, Plaintiff argues that *if* ALJ Garrison erroneously evaluated Dr. Chang's opinions, then those errors would be harmful. (Doc. No. 20 at 9.) However, the Court finds this argument irrelevant, as Court has determined that ALJ Garrison's treatment of Dr. Chang's opinions was proper.

*B. Plaintiff's Objection to ALJ Garrison's Evaluation of Dr. Lakhani's Opinions*

Plaintiff also objects to Judge Knowles's finding that ALJ Garrison properly rejected Dr. Lakhani's opinions by arguing (1) that ALJ Garrison failed to evaluate whether Dr. Lakhani's

18

opinions should be accorded controlling weight, (2) that ALJ Garrison based her evaluation on improper grounds, and (3) that ALJ Garrison's errors were harmful. (Doc. No. 20 at 9–12.) Plaintiff objects to the following paragraph from ALJ Garrison's opinion:

> Dr. Lakhani also saw the claimant on only a few occasions over a period of a few months and for only fifteen minutes at a time. She seemed to be basing her assessment on the MHC records, the claimant's subjective reporting, or both. Dr. Lakhani was also basing her assessment upon a diagnosis of borderline intellectual functioning versus mental retardation; even though she admitted she had no records to base that upon. Dr. Lakhani's assessment, therefore, receives little weight.

(Tr. 514.)

As stated above, a treating source is given controlling weight when his opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other evidence in the record. 20 C.F.R. § 404.1502. An ALJ may properly reject the opinion of a treating physician that is not sufficiently supported by medical evidence. *See, e.g., Combs*, 459 F.3d at 652. ALJs are also required to give adequate reasons for rejecting the opinions of treating physicians only if they find the opinions "inconsistent with other substantial evidence in [the] record." *Smith*, 482 F.3d at 876. Furthermore, "evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004.)

Here, Plaintiff was insured through March 31, 2008, and needed to establish disability on or before that date in order to be entitled to receive benefits. (Tr. 496.) Thus, Plaintiff's 2009 relationship with Dr. Lakhani began after the expiration of her insured status. In addition, ALJ Garrison did not outright "reject" Dr. Lakhani's assessment, he merely afforded it little weight. (Tr. 514.) Similar to his reasoning with respect to Dr. Chang's opinions, ALJ Garrison determined that Dr. Lakhani's opinion was inconsistent with objective evidence viewing the

19

record as a whole. (*Id.*) Applying the regulations discussed above, the Court finds that ALJ Garrison appropriately articulated reasons for giving Dr. Lakhani's opinions little weight.

Further, ALJ Garrison explained that the MHC records were inconsistent with the overall narrative of the progress notes from Centerstone. (Tr. 513–14.) ALJ Garrison noted that Dr. Lakhani indicated that she had "no records" on Plaintiff's Medical Source Statement in reference to her intellectual functioning. (Tr. 899.) Without concrete medical evidence, the Court finds it was reasonable for ALJ Garrison to give Dr. Lakhani's assessment and opinions little weight.

Finally, Plaintiff's argument that ALJ Garrison's errors with regard to Dr. Lakhani were harmful is also irrelevant here, as the Court finds no error in ALJ Garrison's assessment of Dr. Lakhani's opinions.

## IV. CONCLUSION

For the reasons stated above, the Court **ADOPTS** the Report, **DENIES** Plaintiff's Motion, and **AFFIRMS** the decision of the Commissioner. This Order terminates the Court's jurisdiction over the above-styled action, and the case is **DISMISSED.**

It is so ORDERED.

Entered this the 12 day of September, 2013.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT